The first case up this afternoon is Hollingshead v. A.G. Edwards & Sons, No. 5-12-0095. And Mr. Martin, for the appellant, you may proceed. Visual aids. We don't get them very often. Once in a while. Go ahead. Very good. Thank you, Your Honor. Good afternoon, and may it please the Court. My name is Eric Martin, and I represent the defendants in this case, A.G. Edwards & Sons, Incorporated, and Leonard Cease. This Court should reverse the trial court's order denying a motion to dismiss and compel arbitration. Five arbitration provisions are at issue, any one of which is sufficient to compel arbitration in this case. The trial court erred first by invalidating four arbitration agreements that were signed in 2001, at the time that Selma Elliott was transitioning her account from being a joint account to a transfer-on-death account. It erred in invalidating those because, as plaintiffs concede, the defendants received no benefit by this. So there can't be procedural unconscionability or undue influence because the defendants received no benefit. And then second, a 1988 agreement to arbitrate was broad enough to cover any and all claims in any account. That also mandates arbitration in this case. Now, turning to the 2001 agreements, and I've kind of laid these out here on a graphic just to kind of keep all the moving pieces together. If we break up the five arbitration agreements into three different categories, we've got the one back in 1988 when an account was first opened with Selma Elliott and her two daughters, Blanche and Pat, in the UDCs. That was a joint account, meaning that if someone died, the remaining survivor would receive the assets. That was transitioned in 2001 to a transfer-on-death account in which some of the children of the sisters would be protected. Blanche and Pat had three daughters. The three daughters were the ones who were bringing this suit through the estate. So in 2001, we had three different agreements that were signed by Selma Elliott in conjunction with changing her account to a transfer-on-death account. And then there was one other document that was executed in conjunction with that TLD change that was signed by Judy Seeks, who was the power of attorney. Again, any five of these are sufficient to send this to arbitration. Now, focusing first on the arbitration agreements signed by Selma Elliott, the trial court ruled that her signature on these documents was a result of procedural unconscionability or undue influence. Specifically, the trial court was concerned because Ms. Elliott was at an advanced age, although it was stipulated that she was 99. So she was engaged and fully present. That was not an issue. But there was concern by the trial court judge that she had poor eyesight and that she signed these agreements and that Leonard and Judy, 10 years previously, couldn't recall exactly who was in a room when it was signed and exactly what was read to her. So on that basis, those were invalidated. However, in this case, as we tried to point out at the trial court level, there was no benefit that came to the defendants by this change from the joint account to the transfer-on-death account. The only thing that the trial court mentioned that could have been different was that options and margin trading occurred in the account after this occurred. But the uncontroverted testimony was that options and margin trading existed back here, back here in the joint account. The second issue that I'll purposefully just highlight this is the 1988 joint account had an arbitration clause. It was approved for margins, margin trading, approved for options. All of that was the same with the 1988 account and the 2001 account. That is significant because that's the only item that the trial court was concerned about. The trial court, in essence, was looking at post-trading activity after the account and said that he was troubled by some of the things that occurred there. But our point was that that was not an issue with the change in account status. The change in account status… Let me just ask a question here. Yes. The cause of action against A.G. Edwards and the Sons, is that planned as a principal agent through Leonard and Judy? It is. It is, Your Honor. All right, so in setting aside whether there's any showing of benefit at all, okay, is there a showing of benefit to Leonard Suisse in the change of these accounts? No, no, Your Honor, none whatsoever because, again, his ability to trade in the account on behalf of his Elliot was unchanged, absolutely unchanged. The only difference was that a joint account is different from a transfer-on-debt account based upon who can take the assets after death. And ironically, as we pointed out in our brief, this may be the first time in the history of Illinois law where the party that actually benefited by the change is now alleging procedural unconscionability because the granddaughters, in this case, would have had no rights to the assets. In 1988, there was A.G. Edwards and 2001's son, right? Yes, 1988. Both of them? Right, yes. Someone had the Edward Jones, though. That was prior to 1988? That's correct, Your Honor. The account, the account which became the joint account in 1988, actually prior to that time was with Edward Jones. Ms. Elliot's husband pre-deceased her by a few years in the early 80s, and he had always had his account at Edward Jones at that time. So in 1988, the account was changed to this joint account, transferred to A.G. Edwards, and was set up in the name of Selma Elliot, Lance Pack, and Judy DeCease. And again, there's no allegation whatsoever that there was anything improper or untoward about the 1988 agreement. Let me just ask one other question about that. You know, the 1988 account was a joint account, so I presume that all three persons on the account would have gotten statements, and which would have shown all this trading activity that Leonard Suisse became involved in after 2001. So that these other people, beyond the 99-year-old owner, would then have known all this trading activity was going on. True? Your Honor, I'm not sure how the statements were titled. I mean, this was an account that was primarily Selma Elliot's. It was her account from her – with her husband, a joint account previously committed to Jones. What does the record show about why this was changed to an on-debt account, transferred on-debt? Right, and the record is uncontradicted on this point, that Mr. Suisse, who was both her son-in-law and broker, had attended a course in which he had learned about the benefits of transfer on-debt accounts. And you had a situation where Selma Elliot was in the nursing home, and her daughter Blanche was in the same nursing home and in very poor health, suffering from diabetes and other things. So it just seemed logical, and as it turned out, Blanche, the daughter, pre-deceased the mother, it just made sense to be able to make sure – safeguard both lines of the family and accomplish that change. And there's been no dispute that there was anything wrong or improper about that. You don't think there'd be any benefit to him that other people then wouldn't know about all this trading activity? No. I mean, there was nothing in the record whatsoever about that or that – even if the others were receiving statements during that time. That was never raised as an issue, and that is not the basis for the court's decision. Assuming you're correct that Suisse obtained no benefits, let's assume that. Yes. Do you think that means that there can absolutely be no finding of undue influence then? I do, Your Honor. You do. Because the very definition of undue influence is that you're overpowering the will of someone to do something that they otherwise would not have done. Again, the plaintiffs in this case are not alleging that she would not have made this a TOD account. Indeed, they've got to have a TOD account to even be in court, so they're not saying that. And again, there's going to be no unfair surprise. She had arbitration as a part of her account back in 1988. So again, this is not those cases where something's changing. There's some dramatic departure from a different state of affairs. This is all consistent. It's all a linear line. There's no change in that benefit. And what the plaintiff wants to do in this case is to put on blinders. They want to say, oh, difficulty recalling 10 years ago what happened, therefore must be procedurally unconscionable. But all of the case law, all of the case law, cited by plaintiffs, cited by us, shows there's always some benefit. There's always some advantage that's gained by the undue influencer, whether it's something in a will where someone is getting the family harmed and the otherwise we're not going to get. Or you've got a situation where an attorney drafted a will, maybe receiving a request. There's always something in there that has a basis of undue influence of gaining advantage. And here there's simply no showing of that, no showing whatsoever. Unconscionability, the entire doctrine, and we use the case that plaintiff cites on that, the Bishop v. Weedcare-Hare case, the doctrine of unconscionability is designed to prevent overreaching at the contract formation stage. Again, how can you have overreaching if you are not altering the terms of the agreement? And again, the only thing that the trial court indicated was an issue was the later options and margin trade. Leonard Seas testified, and there's no testimony opposite of this, that that was consistent with how the account was opened up in 1988. And to corroborate that, just to make sure we put the exclamation point on that, at the trial court suggestion we were allowed to submit things after the hearing. One of the things we submitted was an affidavit from the corporate headquarters establishing that very fact, that back in 1988 we had the ability to trade in options and margins. So the one lynchpin that the trial court decision is based upon… Why did he need to have her sign it then if he already had that? Why did he have her sign options and margins? Because, Your Honor, the transfer on death account itself was being set up as this account. But he didn't have her sign that until the next day. Well, right, and the entire account would not have been in effect until all of this else occurred. You see what I'm getting at, though. He had her sign the options account and the margin account before the TOD account was signed or in effect. Right, but the assets weren't transferred yet. This was all part of the preparation for getting this new account up and going. Yeah, I mean there are the paperwork you guys, different dates on this, but one thing that we try to be very clear in the trial court… It's right there on your chart. Exactly, exactly. There were only two accounts. I mean even though we've got different agreements, all of these agreements in 2001 relate to one account. So on that basis, there simply can't be any material change, any benefit to them. In our briefs, we use the example of a $1,000 signing bonus. If Ms. Elliott had signed this contract and had been entitled to a $1,000 signing bonus and that hadn't been read for her under the plaintiff's theory, that is still procedurally unconscionable. And that shows how the plaintiff's theory simply doesn't hold up under Illinois case law. Every case in which you've got this undue influence of procedural unconscionability, something bad is happening. Now, even to take this a step further, even if there had been something that was being gained or benefited, which irrefutably there wasn't, that doesn't stop there. And the Fifth District has had a chance to opine on this, both in the Best case and the Wiginton case. All of those cases talk about the fact that the analysis doesn't stop there. If there is procedural unconscionability, you've got to have more than just a degree of procedural unconscionability. I think in the Best case— I think I dissented in that case. Anyway, go ahead. I recall your argument. I recall your argument. And in your dissent, you pointed out that in that case that there was evidence in the record that she had not seen that arbitration provision at the time she signed the agreement. But nonetheless— Which is part of the court's finding here is whether it's read to her, right? That's right. Because part of—some of our case law says that if you never have an opportunity to see, read, or even learn about a provision, how can you be adopting it? How can you be agreeing to it? If that's the procedure that's adopted, where you never even get to see it or know what's in there. And, of course, she was blind. She might have been arguing about Tony Luisa, but she couldn't read the contract, right? The testimony was she did have trouble seeing. I don't think she was completely blind, but she always did have trouble seeing. The point, though, is in that example, it was a surprise. And the court's focus on this is an unfair surprise here. We go back to this chart. For 13 years, she had had an account with A.G. Edwards that was subject to arbitration. Breaking the status quo would have been an account without arbitration. So, for example, in the best case, there was this analysis about whether she had seen it before the purchase, and they accepted the version of events given that she had not. And, nonetheless, the court went on to find that that did not rise above that degree, that mere degree of procedural unconscionability. And so, again, in this case, just to kind of break it down, we don't have that because we don't even meet the definition of unconscionability or benefit or advantage. Even if we did, we don't get past the degree of unconscionability in this case. And undue influence, of course, is a subset of procedural unconscionability. And there's, again, no record, no evidence whatsoever that she would not have done this but for Leonard Cies. Indeed, it would seem having a TOD account would be within someone's wishes. And plaintiffs, again, can't dispute that because without that, I mean, they're subject to immediate dismissal, which does raise an issue. And moving to the 1988 agreement, if the trial court opinion were to stand, where does that leave us? Well, as we set forth in our brief, then you go back to the 1988 agreement. And the 1988 agreement clearly has an arbitration provision and the plaintiffs have no standing whatsoever because their mother, pre-deceased Selma Elliott, they have no right to the proceeds. So the 88 agreement comes into play in two ways. First of all, we take the trial court's decision as it is. We go back and 88 controls. But even apart from that, even apart from the effect of the trial court's order, the 88 agreement applies independently because as it's worded, it applies to all claims in any accounts that she has with A.G. Edwards. And the closing of the account does not impact that. It's broader than that. So I'm a customer of A.G. Edwards. I close my account and I come back, say, a year later and open a new account. Are you saying that my old account agreement still governs? And if so, then what do I have to do besides close the account to get rid of that agreement? Certain aspects of the contract would survive that, Your Honor. And, for example, this agreement says any and all accounts at any time. There's a specific procedure that is set up if you want to completely get rid of this agreement. And that's set out in the agreement? That's set out in the agreement about sending in a notice of revocation to the director of operations of Edwards, all of that, no evidence whatsoever, nothing in the record that that occurred. We cite case law, both from the Northern District and the Supreme Court of Idaho, which shows that if you've got a different account, not an account in which the alleged bad things happen, but a different account that has an arbitration provision, that's broad enough. That's good enough. That covers anything and everything. There's no case law that's cited in opposition to our point on that. The trial court simply dismissed it that it was an over account with no evidence. Well, he said it superseded it. He didn't use the word novation. Right. And we assume that in our analysis in responding to that. But, again, we show how that simply is not supported by legal precedent, that this 88 Agreement, which says shall cover individually and collectively all accounts, which the undersigned may have at any time, is broad enough to cover that. So the 88 Agreement comes into play in a few ways. It shows that there's no change in the arbitration provision, showing you can't have procedural and non-procedural in here. It comes into play because if you blow up the 2001 Agreement, come back, this is the status quo. And finally, standing alone, on its own, it provides that any and all claims are subject to that. The final arbitration provision that bears mentioning is the Asset Account Agreement that's signed by Judy Sieves. The trial court lumps that one in there as well as being void because of procedural unconscionability and undue influence. But there's no reasoning as to how – or no explanation as to how a document that is validly signed by the power of attorney, with no challenge to the power of attorney, how that can't be effective on its own. Let me ask another question. I'm sorry to keep interrupting you, but the Asset Account Agreement, is that kind of the umbrella agreement, or what's that about? I believe in the record there's testimony that that dealt with check-writing privileges and that's – check-writing privileges and that sort of thing. So each of these has a different component. There was also a new account card which was signed. So there's always lots of paperwork in setting these things up, and this was simply part of that paperwork. Does the record suggest anything that happened between January 10th and February 1st that would have prevented Selma Elliott from being the person to sign the Asset Account Agreement? I know. I know, Your Honor. This was simply a matter of convenience and getting it done is what was in the record. And again, the plaintiffs in their brief state that it has to be – this agreement has to be voided and is not effective because she was not acting in the best interest of Selma Elliott in doing so. But that begs the question and goes back to our benefit advantage analysis. Why? The TOD account in no way benefited Judy Cease, Leonard Cease, A.G. Edwards. The only folks that benefited were the actual plaintiffs in this case, and so that's why the trial court's decision simply upends Illinois law on this and is a real outlier in terms of what procedural unconscionability doctrine and undue influence applies to. So, Your Honor, for these reasons, we believe that it is appropriate to remand this case with directions to dismiss and compel arbitration. Five different agreements to arbitrate control this issue. Absolutely no procedural unconscionability or undue influence associated with the 2001 based upon the continuance of the status quo. And then standing alone, on its own, the 88 Agreement provides a basis for arbitration. All right, thank you. We'll give you some time on rebuttal here in a few minutes. So, Ms. Reese, you may proceed. Good afternoon, Your Honor. May it please the Court? There are a few things I want to address, and I'll kind of skip around a little bit because I think they're important. Mr. Martin kept referring to the plaintiffs in this case. I want to be clear on who the plaintiff is in this case. The plaintiff is Carol Hollingshead, who is the granddaughter of Selma Elliott, and she is a plaintiff by virtue of being the executor of the estate. This is an estate case. The estate of the plaintiff is not Carol and her sister's, so references to the plaintiffs is simply a misnomer. So she stands in the estate of Selma Elliott? Correct, Your Honor. I think that's an important distinction to make. I also think another important distinction in this case is that this is not a typical broker liability case. If this was a typical broker liability case, plaintiffs admit they would be in front – the plaintiff admits she would be in front of FINRA, but it's not. We're talking about a 99-year-old woman who, by all the testimony in the record, could not physically read these documents. She relied on her broker, slash son-in-law, and her daughter, slash power of attorney, or attorney-in-fact, to read these documents to her. What portions of those documents they chose to read to her were really entirely up to them, and she had no way of knowing when she signed these documents what portions or if all of the portions had been read to her. Isn't there also an inconsistency between their deposition testimony and what they testified to in hearing about what was read? Yeah, there are significant testimony issues that Judge Mudge really took note of, and there are key points. The testimony issues that were inconsistent was – and the interesting point is that Judy and Leonard were consistent with each other, but inconsistent between their depositions and the hearing. So at the deposition period of time, they testified consistently with each other. Then at the hearing time, they both testified consistently with each other, but inconsistent with each of their deposition testimony in the following ways. The first one was who was present when Selma signed these January of 2001 documents. In their deposition testimony, both Leonard and Judy testified that Blanche Take, who is Judy's sister and the other daughter of Selma Elliott, who is in the nursing home, was not present. At the hearing, they both changed their mind and decided that she was, in fact, present and participated in these conversations. The other piece of testimony that was inconsistent was what provisions of these documents were read. And we went over this in the deposition. They're part of the record now. They were submitted to the trial court. In both Judy and Leonard's depositions, they testified that they could not recall what portions of the documents were read. They repeated that more than once. At the hearing, Leonard was absolutely certain that he read the arbitration provision to her. If no other provision, which the court found a little incredible given the fact that there were other provisions in the agreement that would seem to be more important given the situation. Likewise, Judy testified the same way. At her deposition, couldn't recall what portions were read and by whom. At the hearing, absolutely certain that Leonard had read these arbitration provisions, if nothing else. Finally, the February 1, 2001 agreement. During their depositions, they testified that this was signed by Judy at the nursing home, in front of Selma, and after reading the document to Selma. Then at the hearing, they both testified that this document, this February 2001 document, was actually signed in Leonard's office without Selma's knowledge or presence. So we've got some serious inconsistencies. Mr. Cease also testified at the hearing that any client of A.G. Edwards could negotiate out the mandatory arbitration provision of any of these agreements. All they had to do was say so. When we got into a little more detail on that, when he was questioned further on that, he could not cite one instance where anyone has ever been able to negotiate out one of these mandatory arbitration provisions. Going back to the hearing, since we're on that subject, Mr. Martin indicated a few times that Judge Mudge relied heavily on this post-agreement trading activity. Quoting from Judge Mudge, what he said was, he said he... The court stated, this court finds the post-agreement trading activity has some relevance to the circumstances surrounding the signing of these agreements in January of 2001, and then goes on to say that the court's focus is more on the relationship between the parties and the circumstances surrounding the execution of the agreements than what happened to the stock market in 2002. And that's our position, too. If this doesn't read the procedural unconscionability, we don't know what does. It's clear that very likely these arbitration provisions were never read to Selma Elliott. She had no ability to read them on her own. It wasn't as if she had the documents in front of her and chose not to read these provisions. She was relying on the broker. The next thing that Mr. Martin addresses repeatedly is this requirement that there be some benefit. I think there's a bit of a confusion here between what would be a will contest standard of review and what would be a contractual standard of review. And in the restatement of contracts, there is no requirement that there be... that the person exerting the undue influence benefit from the contract. And, in fact, the party exerting the undue influence can be a third party to the contract. That's in the restatement, Section 177.3, and in the patent jury instructions, 700.12F. So I think it's pretty clear here that there's no requirement of undue or of benefit to the person providing the undue influence in a contractual case as opposed to a will contest case. We've talked about... I'll make sure I catch everything here. We've talked about this 1988 agreement quite a bit. Our opinion is this is kind of an illusory argument. This wasn't even addressed in the first motion to dismiss when we came up to the appellate court the first time. The 1988 agreement, even the defendants didn't think it had any bearing on it or they would have brought it up at that point. It wasn't until we got back down to the trial court that this 1988 agreement is dredged up. We consider it a last-ditch effort to pull something out of the trash that might apply. If it was still applicable to the new accounts, these 2001 accounts, I don't see the need to sign new account agreements if the old ones still apply. So we think that's an illusory argument that that agreement, the 1988 agreement, was tied to an account that was closed. The new agreements relate to the new account, and the new account is where all of the activity took place that we allege to be a breach of the fiduciary duty and the broker liability. One other thing that Mr. Martin touched on briefly was that if we find the arbitration provision doesn't apply, the entire 2001 agreements have to be thrown out. I'm not sure that that's really the case, and that's certainly not what a plaintiff contends in this case. We know that Selma did sign these documents. There's testimony to that effect. We know that certain provisions of the documents were read to her. We're not saying that the agreements in total need to be thrown out. The question here is strictly on this motion to dismiss whether arbitration is required and whether these arbitration provisions were read to her, and the testimony to date is inconsistent at best on that issue. Not to mention that the 2001 agreements, each one of them contains a severability provision where the arbitration provision can be severed from the rest of the agreement and the rest of the agreement may stand. As for the 2001 agreement signed by Judy, it's quite clear from her testimony that it's so inconsistent as to why she signed this document and whose insistence she signed this document. She was acting at her husband's request and not as attorney-in-fact for Selma Elliott because she was not acting in Selma Elliott's best interest. She was acting at her husband's request, whether based on his undue influence or some other reason, we're not sure, but we believe for that reason that the February 2001 document should be thrown out as well. That's all. All right. Thank you very much, Ms. Breese. Thank you. Rebecca? Thank you, Your Honor. Just a couple of quick points. There's reference to the testimony issues. Again, the thesis were being asked about what happened 10 years prior. Leonard Zies in trial said that his main practice was to read such provisions and that he, again, felt that he did so. In this case as well, putting all that aside, again, there can't be any surprise that an arbitration provision, because it was in the 88 and it was in the 2001. And this idea that procedural unconscionability doesn't require any benefit, find any case, any case in Illinois history in which there's not been an allegation of benefit for the other side. And it's very critical that the other side's not contesting this or conceding this that this case would stand alone apart from Illinois law and any other case we've been able to find where you have procedural unconscionability without some showing of benefit or advantage. So I noticed that there was a reference to going to the restatement. Even the illustrations in the restatement talk about the fact that there is a benefit for someone, whether it's someone in concert with the person alleging undue influence or otherwise. In this case, there's not. The only people that benefited were the plaintiff. And there's reference to the estate being the plaintiff. That's true. Carol Hollings said it is the granddaughter and the estate, again, a part of that estate, those who would be entitled to collect under it would be the granddaughters, the other two daughters. So that is there has to be a benefit. The 1988 agreement, Your Honors, was not something that we pulled out of the trash just for fun. We did this because, if you recall, this is our second time in front of you. In the first case, we attached an affidavit with an agreement to arbitrate. The other side filed absolutely nothing in opposition, no affidavit. There was no hearing. There was nothing. But yet the court still in that case refused to compel arbitration. This court said that was inappropriate, sent us back down, allowed time for an evidentiary hearing. And as a part of that, we attached a full record of what had gone on so that we could show that there had been no change in some of the core features of this account. At the end of the day, the estate has a full and fair opportunity to try its claims. It should do so, though, where the five different arbitration agreements mandate that it takes place. And that would be in front of the Financial Industry Regulatory Authority, the FINRA, which, as we said in our briefing with the trial court, which is a part of the record, that it handled 5,680 cases in 2010. There's a forum that is set up for these types of disputes. They'll have a full and fair opportunity to address any of these issues with FINRA. For those reasons, we respectfully request that this court reverse the trial court and mandate that an interim order dismissing the case and compelling arbitration. Thank you very much. We thank you both for your excellent briefs and arguments, and we'll take this matter under advisement and issue a decision in due course.